OPINION OF THE COURT
Catterson, J.
In this CPLR article 52 turnover proceeding, we affirm that a restraining notice is effective only if, at the time of service, the third party on whom the notice is served owes a debt to, or is in possession of property of, the judgment debtor.
In this proceeding, Verizon, the judgment creditor, seeks to enforce a restraining notice against a third party pursuant to article 52 of the CPLR, on monies paid by Transcom Enhanced Services, Inc. (hereinafter referred to as Transcom) to judgment debtor, Global NAPs, Inc. (hereinafter referred to as GNAPS), a telecommunications vendor. Transcom purchased voice-over-internet termination services for its customers from GNAPS.
The following facts are undisputed: On January 29, 2009, the U.S. District Court for the District of Massachusetts entered a $57,716,714 judgment in favor of Verizon and against GNAPS and others. The judgment was affirmed. (See Global NAPs, Inc. v Verizon New England Inc., 603 F3d 71 [1st Cir 2010], cert denied 562 US —, 131 S Ct 1044 [2011].)
On March 6, 2009, Verizon domesticated the judgment in New York. On March 30, 2009, Verizon served Transcom, a New York corporation, with a restraining notice and information subpoena. The restraining notice directed Transcom not “to make or suffer any sale, assignment or transfer of, or interfer *205 ence with, any property in your possession in which [GNAPS] . . . has as interest.”
On or about February 11, 2010, Transcom served its response to the information subpoena. In response to question No. 2, which directed Transcom to “[ijdentify any and all . . . agreements entered into between you . . . and any of the Judgment Debtors,” Transcom identified a telephone switch service agreement dated October 21, 2003.
In response to question No. 5, which asked Transcom to identify any receivables and outstanding obligations owed to GNAPS, Transcom stated, “None. All payments are made in advance or contemporaneously with service.” In response to question No. 11, which asked Transcom to identify payments made to GNAPs, Transcom annexed a Vendor Balance Detail (hereinafter referred to as VBD). The VBD reflected that on April 1, 2009, the day before Transcom’s acceptance of the restraining notice, Transcom had received a $246,000 bill from GNAPS. The bill was paid by four checks issued for April 1, April 6, April 15 and April 21, each in the amount of $61,500.
On or about March 31, 2010, Verizon commenced a special proceeding seeking, inter alia, a turnover of property and debts of the judgment debtor held by Transcom, a judgment equal to the amount paid by Transcom to the judgment debtors in violation of the restraining notice, and a finding of civil contempt. Verizon asserted that Transcom’s agreement with GNAPS created an ongoing contractual relationship which required Transcom to pay GNAPS $281,000 per month.
Transcom asserted that it did not violate the restraining notice because GNAPS’ monthly invoices were issued in advance of services being rendered, and Transcom had no obligation to use GNAPS’ services. Transcom explained that, because it prepaid for GNAPS’ services at the time that the restraining notice was served, Transcom did not owe GNAPS any money.
Transcom submitted the affidavit of Larry Dewey, its chief accounting officer and a CPA whose duties included managing payments to GNAPS. He set forth that, since 2004 GNAPS had invoiced Transcom on or at the beginning of each month for services to be rendered in the following month and Transcom paid in advance for services to be rendered on an approximately weekly basis. Dewey set forth that, as of April 2, 2009, Transcom had a credit balance with GNAPS and no obligation to make future payments. He issued the April 1 check to GNAPS by overnight delivery for services to be rendered the first week in April. Dewey stated that
*206 “because Transcom and GNAPS have always operated . . . under the assumption that Transcom pays in advance for services, and GNAPS only provides services if it has been paid. Transcom . . . could easily switch to [other] vendors and discontinue using GNAPS simply and quickly by entering a blocking code in the network operations center.”
Transcom also submitted the affidavit of Bradford Masuret, GNAPS’ vice-president of sales, who set forth that the parties verbally agreed to allow Transcom to prepay in four installments, rather than the two provided for in the written agreement.
By order, dated April 12, 2010, the court declined to extend the terms of the restraining notice, and scheduled the matter for a hearing on April 19, 2010. At that hearing, Transcom called two witnesses, Dewey and Scott Birdwell. Verizon did not call any witnesses and relied on Transcom’s response to the information subpoena.
Dewey gave testimony consistent with his affidavit. He stated that Transcom never owed money to GNAPS because it prepaid for services for the following week, making payments for the month in four equal installments. Dewey conceded that, on its face, the VBD reflected a $246,000 accounts payable to GNAPS on April 1, 2009, and a $184,500 debt to GNAPS as of April 2. However, he explained that such a view of “the records would be incomplete,” as Transcom did not owe GNAPS any money as of April 2, 2009, and the balance listed as of that date was for services which had not yet been provided.
Scott Birdwell, Transcom’s chief executive officer, testified that Transcom’s relationship with GNAPS has been “strained” for years due to poor service quality, and that the parties had been operating pursuant to a verbal arrangement for several years because Transcom did not trust GNAPS’ financial condition or its reliability in providing service. Under the verbal arrangement, Transcom prepaid for services one week in advance, committing itself to take services only for the week covered by the prepayment. After the week, if GNAPS service was still running, Transcom would then pay for the following week. The court denied the turnover, dismissed the petition, vacating all restraints, and denied the application to hold Transcom in contempt. (27 Misc 3d 1236[A], 2010 NY Slip Op 51073[U] [2010].) The court credited Dewey’s and Birdwell’s testimony as to the oral modification of the payment terms of the agreement, *207 and found that such modification was proper under Massachusetts law, which governed. The court further found that the prepayment for services was not a form of property or debt subject to restraint.
On appeal, Verizon argues that, as of April 2, 2009, Transcom possessed GNAPS’ property, and contemptuously continued paying GNAPS, entitling Verizon to damages in the amount improperly paid. Verizon further argues that GNAPS’ “bundle of rights” under the agreement was property subject to restraint, regardless of any prepayment, especially concerning the outstanding balances reflected in the VBD for April 2009. Verizon also maintains that the court erred in finding that the agreement was terminable at will, as there was no testimony that the requirement of 30 days’ written notice was modified.
For the reasons set forth below, we find that Transcom, the third-party garnishee, owed no debt, but rather held a credit balance with GNAPS. Moreover, the undisputed modified agreement between GNAPS and Transcom dispensed with any contractual obligations or “bundle of rights” that could be considered attachable property.
CPLR 5222 (b), in relevant part, states:
“A restraining notice served upon a person other than the judgment debtor or obligor is effective only if, at the time of service, he or she owes a debt to the judgment debtor . . . or . . . is in the possession or custody of property in which . . . the judgment debtor . . . has an interest .... All property in which the judgment debtor ... is known or believed to have an interest then in and thereafter coming into the possession or custody of such a person, including any specified in the notice, and all debts of such a person, including any specified in the notice, then due and thereafter coming due to the judgment debtor . . . shall be subject to the notice.”
In this regard, “[a] money judgment may be enforced against any debt, which is past due or which is yet to become due, certainly or upon demand of the judgment debtor.” (CPLR 5201 [a].) Additionally, “[a] money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested.” (CPLR 5201 [b].)
The statute therefore codifies well-established principles by eliminating enforcement of judgment, whether by attachment *208 or restraining notice on a third party, on a general category of contingent debts and property rights based on contractual contingencies. (See Matter of Supreme Mdse. Co. v Chemical Bank, 70 NY2d 344, 350 [1987] [statute precludes the “levy against contingent obligations not certain to ripen into something real” (internal quotation marks omitted)]; see also Glassman v Hyder, 23 NY2d 354, 358 [1968] [where “a duty to pay is conditioned . . . upon contractual contingencies, there is no debt certain to become due”]; Sheehy v Madison Sq. Garden Corp., 266 NY 44, 47 [1934] [judgment debtor’s right to payment was not attachable because it was a “mere right to earn money” and was entirely contingent upon judgment debtor’s performance]; Herrmann & Grace v City of New York, 130 App Div 531, 535 [1909], affd 199 NY 600 [1910] [“indebtedness is not attachable unless it is absolutely payable at present or in the future, and not dependable upon any contingency”].)
In this case, it is undisputed that the contract between Transcom and GNAPS was orally modified to one based on Transcom’s weekly prepayment for services. The contract no longer contained the previous terms of payments by Transcom every half-month for the following half-month’s services and where the agreement was automatically renewed and subject to 30 days’ notice.
At the time of the restraining notice issued by Verizon, it is uncontested that Transcom was ordering GNAPS services on a weekly basis by weekly prepayment. Supreme Court credited the uncontroverted testimony of Transcom executives that Transcom was not contractually bound to purchase the services and there was no exclusive relationship between it and GNAPS. Thus, there was no debt due or certain to come due “by the mere passage of time [or by demand of the judgment creditor].” (See Siegel, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C5201:l.) Transcom’s prepayment effectively gave it a credit balance with GNAPS upon which GNAPS had an obligation to provide the service.
Nevertheless, Verizon argues that “the timing of the payments to [GNAPS] does not alter [GNAPS’] right to be paid for the services it delivers.” Verizon relies on ABKCO Indus. v Apple Films (39 NY2d 670 [1976]), to argue that the fact that no monies were owed to GNAPS at the time the restraining notice was served is not relevant. Rather, Verizon argues that the prepayments are a “bundle of GNAPS’ rights” under the agreement, and therefore attachable property. The dissent adopts this view. Verizon and the dissent miss the point.
*209 In ABKCO, the judgment debtor, LTD, owned a movie “Let It Be,” which featured the Beatles. LTD entered into a licensing agreement with a New York corporation, INC, which agreed to promote the movie in the United States and to pay LTD 80% of the net profits from the promotion. The Court found that ABKCO, a judgment creditor, had an attachable interest in the right to future net profits received from the promotion of a film. (39 NY2d at 674.) The ABKCO Court rejected LTD’s argument that the rights were not attachable because no sums were due at the time of attachment and because it was not known whether any amounts would become due since they were contingent on gross receipts. Instead, the Court found that LTD’s interests in the licensing agreement
“constituted property, composed of the bundle of all its rights under the Agreement, of which . . . the obligation of INC to pay [LTD] under the 80% clause [relating to net profits received by INC from the promotion of the film] was the principal feature of economic significance. That property was attachable because concededly it was assignable by LTD.” (39 NY2d at 674, citing CPLR 5201 [b].)
ABKCO is not analogous to the instant case: ABKCO stands for the proposition that if one of the judgment debtor’s rights under a contract is an obligation by the other party to pay some amount at some future date, that right is assignable and attachable even if the value is contingent. In other words, under the ABKCO agreement LTD had an unconditional right to receive 80% of gross receipts from the promotion of the movie. The fact that the 80% did not translate into a stated amount in dollars and cents at the time of attachment was irrelevant. It was not LTD’s rights that were contingent, but simply the value of those rights.
Upon a “proper analysis and classification of [GNAPS’] rights under the . . . [a]greement” as mandated by ABKCO (39 NY2d at 674), we must conclude that GNAPS does not have any rights under the modified agreement: there is simply no obligation for Transcom to purchase services from GNAPS. Thus, GNAPS has no right to payment that it could assign or that could be attached by its judgment creditors. Transcom correctly asserts that a contract is not a property subject to possible attachment if that contract does not obligate the other party to pay the judgment debtor, or if the obligation to pay is contingent upon some uncertain future act of performance by the parties. (See Matter of Supreme Mdse. Co., 70 NY2d at 351.)
*210 Moreover, contrary to Verizon’s argument, the modified agreement dispensed, de facto, with the 30-day notice requirement, and thus with any possible property interest GNAPS may have held in such notice. As Transcom’s executives testified, the modified agreement resulted, in part, because of GNAPS’ unreliability in providing the service; Transcom therefore required the flexibility to switch vendors, “literally at the flip of a switch.” Thus, the credited and uncontroverted testimony of two Transcom executives supports the view that a 30-day notice requirement would have been inconsistent with the nature of the modified agreement and the reasons for such an agreement. This, instead, was a situation where GNAPS’ performance depended on Transcom’s prepayment for services in any given week, and therefore involved “intangibles that may never ripen into a significant property right as where they depend on a contingency that may never occur.” (See Matter of Supreme Mdse. Co., 70 NY2d at 350.)
In Matter of Supreme Mdse. Co., the Court rejected the existence of an attachable property right under an agreement where contingent performance was wholly in the control of the judgment debtor. In that case, the Court found that a beneficiary’s interest in a letter of credit is not the property of the beneficiary for purposes of attachment since the beneficiary’s interest is dependent on its own future performance (timely shipment of goods, compliance with terms of credit and presentation of conforming documents). (70 NY2d at 350-351.) The Court found that, since the beneficiary “retains the option to defeat the interest and render it worthless, . . . allowing attachment . . . could serve as a disincentive to a beneficiary’s performance of the underlying contract.” (Id.)
The Court cautioned that this factor alone is not dispositive in any determination of whether an attachable property interest exists. However, the rationale should be applied to the facts of the instant case where Verizon argues that Transcom could have stopped payment on the check it sent to GNAPS on April 1, 2009. Once Transcom sent the check, contrary to the dissent’s view, the contingent performance would have been solely within the control of GNAPS, the judgment debtor. Further, it is clear that compliance with the restraining notice not only “could serve as a disincentive,” but almost certainly would result in GNAPS declining to provide the weekly service for which the check had been sent.
The dissent’s observation that it would be “unfortunate,” but “irrelevant” if, as a result of Transcom’s compliance with the *211 restraining notice, GNAPS terminated its service to Transcom, indicates that it completely misapprehends the economic nature of their business relationship. Upon the failure of GNAPS to provide service to Transcom, the latter would be compelled to switch to another supplier/vendor whereupon its “highly regular and predictable business relationship” with GNAPS would terminate, and would thus stop generating any revenues for GNAPS. The net result is that Verizon might gain $61,500 (the amount of the check sent on April 1 for GNAPS’ weekly service) in partial satisfaction of a $57 million judgment; but it would have caused a loss to, and disrupted the business of, an innocent bystander garnishee. Setting aside for the moment, the public policy concern implicit in such a result, more significantly, Verizon would find itself in a situation that the Legislature expressly put beyond the grasp of the statute: levying against a contingent obligation that, in this case, was never again going to “ripen into something real.” (Matter of Supreme Mdse. Co., 70 NY2d at 350 [internal quotation marks omitted].) If the Legislature wants to expand the scope of the statute, it may do so but it is not up to this Court to make this change.
Moreover, contrary to the dissent’s view that “the manner in which Transcom structured its transactions with [GNAPS] could be said to reveal its knowledge of [GNAPS’] plan to shirk its responsibilities,” there simply are no allegations, nor any evidence in the record, that the agreement was forged with the intent of facilitating GNAPS’ avoidance of attachment of debt owed to third parties. On the contrary, according to the testimony of Transcom’s executive officers, the agreement to prepay for services was nothing more than a consequence of GNAPS’ unreliability in its provision of services, and was a deal struck for the benefit of Transcom.
Accordingly, the judgment of the Supreme Court, New York County (Anil C. Singh, J.), entered July 20, 2010, to the extent appealed from as limited by the briefs, dismissing the petition with prejudice, should be affirmed, with costs.